UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>    v.<br><br>**JESSIE MOORE,**<br><br>                    **Defendant** | Crim No. 19-101 (KM)<br><br>**OPINION and ORDER** |

**KEVIN MCNULTY, U.S.D.J.:**

      The defendant, Jessie Moore, is currently serving a federal sentence of imprisonment at the Hudson County Correctional Center ("HCCC"). Now before the Court is Mr. Moore's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), or in the alternative for transfer to home confinement under 18 U.S.C. § 3624(c),. (DE 33). The motion invokes the threat of the COVID-19 pandemic and alleges that Mr. Moore's medical status renders him particularly vulnerable. For the reasons stated herein, the motion will be denied.

      On July 1, 2018, Moore was arrested in possession of a Ruger P100 handgun, loaded with six rounds of ball point ammunition. On April 9, 2019, he appeared before the Hon. William H. Walls, U.S.D.J., and pled guilty to one count of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). On July 24, 2019, the case was reassigned to me.[1] (DE 25) Mr. Moore's Sentencing Guidelines range was calculated at 30–37 months of imprisonment. On August 27, 2019, I imposed a sentence of 30 months' imprisonment. (DE 28)

      The attorney for the United States informs the Court that Mr. Moore remains at the HCCC, and that under current conditions transfer to a federal facility is unlikely. Mr. Moore's projected date of release to home confinement is November 6, 2020, less than four months from now.

---

[1]    Judge Walls, after a pioneering and distinguished career of service to the cause of justice, died on July 11, 2019.

1

Mr. Moore sent the Court a handwritten letter expressing his fear of contracting the COVID-19 virus while incarcerated. (DE 30) On June 24, 2020, I appointed Lorraine Gauli-Rufo, Esq., to represent him. (DE 31) On July 15, 2020, Ms. Gauli-Rufo filed the current motion for compassionate release. (DE 33) The following day, I directed the United States to respond within five days (DE 34), and on July 22, 2020, the United States filed its response (DE 35).

### A. Exhaustion of Administrative Remedies

Mr. Moore states that in April 2020, he filed with the director of HCCC a *pro se* request for compassionate release under 18 U.S.C. § 3582(c)(1)(A). The application was renewed by counsel on May 14, 2020. (DE 33-3) No disposition is reported.

The power to file a compassionate release motion under section 3582(c)(1)(A) is lodged in the first instance with the Bureau of Prisons. Only after the BOP has denied the defendant's application, or after 30 days have elapsed without a decision by the BOP, can the defendant file a motion in court. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia,* 954 F.3d 594, 597 (3d Cir. Apr. 2, 2020) (denying remand of appeal seeking compassionate release as futile in light of lack of exhaustion); *United States v. Epstein,* Crim. No. 14-287, 2020 WL 1808616, at *4 (D.N.J. Apr. 9, 2020) (Wolfson, C.J.) (citing cases).

It is possible to quibble that Mr. Moore did not petition the BOP itself. Through no choice of his own, he has not been designated to a federal institution and is serving his federal sentence in a state institution. He took the logical course of filing his compassionate release applications with his custodian, the director of HCCC. The United States concedes that, more than thirty days having passed, the prerequisite of exhaustion of administrative remedies is satisfied. I accept the concession and agree that Mr. Moore has substantially complied with the exhaustion requirement. He is entitled to bring his contentions before the district court.

**B. Compassionate Release under 18 U.S.C. § 3582(c)(1)(A)**

Hence this motion for compassionate release. Under 18 U.S.C. § 3582(c)(1)(A), the district court is granted limited authority, not to dictate the place or manner of confinement, but to reduce the term of imprisonment, provided certain requirements are met:

> The compassionate-release provision states that a district court "may reduce [a federal inmate's] term of imprisonment" and "impose a term of probation or supervised release . . . if it finds that . . . extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). But before granting compassionate release, a district court must "consider[] the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." *Id.* § 3582(c)(1)(A). Those factors include, among other things, "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense[, and] . . . to afford adequate deterrence to criminal conduct," *id.* § 3553(a)(2)(A)–(B).

*United States v. Pawlowski,* No. 20-2033, ___ F.3d ___, 2020 WL 3483740 at *2 (3d Cir. June 26, 2020) (fn. omitted).[2]

The relevant Sentencing Guidelines policy statement, U.S.S.G. § 1B1.13, echoes the requirement of "extraordinary and compelling reasons," and also requires that the defendant not present a danger to the safety of any other person or the community, within the meaning of the Bail Reform Act, 18 U.S.C. § 3142(g). The accompanying application notes include examples of medical conditions considered "extraordinary and compelling," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). More generally, it defines such a condition would be satisfied by a defendant who is

(I)   suffering from a serious physical or medical condition,

---

[2] Appellee's motion to designate this as a precedential opinion was granted, and the Court ordered that an amended precedential version of the opinion be filed. *See* 2020 WL 4251677 (3d Cir. July 24, 2020).

3

>   (II)   suffering from a serious functional or cognitive impairment, or
>
>   (III)  experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.,* cmt. n.1(A)(ii).

The examples are not exclusive, however, and I consider all the relevant circumstances. We are not in the pre-COVID era, when compassionate release was largely concerned with end-of-life care. This pandemic changes the picture; in combination with a petitioner's particular susceptibility, COVID-19 might dictate a finding that a medical situation is extraordinary, even if it would not have been so absent the pandemic.

I dispense with an overall introduction to the COVID-19 pandemic and the resulting widespread loss of life; it is by now familiar to all. The COVID-19 virus can be transmitted even by persons who display no symptoms. It spreads "mainly through close contact [within about six feet] from person-to-person in respiratory droplets" and from contact with contaminated surfaces. See Ctrs. for Disease Control and Prevention, How to Protect Yourself & Others, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited July 20, 2020). To thwart the spread of the illness, the Centers for Disease Control and Prevention ("CDC") recommend social distancing (staying at least six feet away from others), wearing cloth face coverings when around others, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water, among other practices. *Id.* Obviously, however, the "the best way to prevent illness is to avoid being exposed to this virus." *Id.* There are treatments, but currently there is no vaccine or cure. The danger of exposure in an institutional setting, such as a prison, is particularly acute. *See* CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID) in Correctional and Detention Facilities,

CDC https://www.cdc.gov/coronavirus2019ncov/community/correction-detention/guidance:correction-detention.html (last visited July 25, 2020).

In Section B.1, *infra*, I consider the "extraordinary and compelling reasons" proffered by the defendant. In Section B.2, I consider the "the factors set forth in [18 U.S.C. § 3553(a)]." 18 U.S.C. § 3582(c)(1)(A).

### 1. Extraordinary and Compelling Reasons

The "extraordinary and compelling reasons" inquiry logically has two components: (a) identification of a medical condition that renders the defendant particularly vulnerable to serious consequences if infected with COVID-19; and (b) the likelihood of COVID-19 infection, with particular reference to conditions in the institution in which the defendant is incarcerated.

#### a) Mr. Moore's medical condition

It is not disputed that Mr. Moore has multiple medical conditions. These include Type II diabetes, obesity, epilepsy, chronic obstructive pulmonary disease (COPD), and hypertension. These conditions do not fall within the most severe categories identified in U.S.S.G. § 1B1.13, cmt. n.1(A), quoted above. For example, Mr. Moore is not elderly (he is 32), does not have advanced cancer, organ disease or dementia, and is not suffering from a serious condition that currently impairs his ability to care for himself and from which he is not expected to recover. As noted above, however, the COVID-19 pandemic alters the analysis.

Although COVID-19 can affect anyone, the CDC has identified groups of individuals who "are more likely than others to become severely ill, which means they may require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die." *See* Ctrs. for Disease Control and Prevention, *People Who Are at Increased Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited July 25, 2020). As the CDC continues to

gather more information about COVID-19, this list of individuals at "increased risk for severe illness" has been and likely will continue to be updated. *Id.*

Mr. Moore's most recent medical records disclose the following diagnoses:

> Obesity, unspecified, with a BMI measurement of 40.8;
>
> Chronic obstructive pulmonary disease, unspecified;
>
> Type 2 diabetes mellitus without complications, with a most recent Hgb A1C level of 5.9;[3]
>
> Primary hypertension, with a most recent blood pressure reading of 127/79; and
>
> Other conditions, including epilepsy, bronchitis not specified as acute or chronic, and antisocial personality disorder.

(*See, e.g.,* DE 33-1 at 2)

Three of Mr. Moore's ailments are listed as conditions which place a person "at increased risk of severe illness from COVID-19.": "Obesity (body mass index [BMI] of 30 or higher)" is one;[4] "COPD (chronic obstructive pulmonary disease)" is another; "Type 2 diabetes mellitus" is a third. A fourth condition, "Hypertension or high blood pressure," is listed as one which "might" place an individual at increased risk. (*See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited July 25, 2020).

Overall, a review of medical records reveals that the BOP has afforded Moore regular and adequate care for his conditions. The control of all, with medication, has been "good," and his condition is "stable." (DE 33-1 at 5) That

---

[3]  According to the American Diabetes Association, a person with A1C levels of 6.5% or more is considered diabetic. (*See* https://www.diabetes.org/a1c.). The goal for a diabetic, according to CDC, is to reduce levels to 7%. (*See* https://www.cdc.gov/diabetes/managing/managing-blood-sugar/a1c.html#:~:text=A%20normal%20A1C%20level%20is,for%20developing%20type%202%20diabetes.)

[4]  CDC recently reduced the obesity guideline from BMI ≥ 40 to BMI ≥ 30. Mr. Moore's obesity meets either standard.

assessment is corroborated, in part, by his A1C level of 5.9 and blood pressure of 127/79, both of concern but neither of them severe.

Complicating the picture is Moore's periodic refusal of treatment.[5] Some recent items of medical history include the following:

> 4/9, 4/10, 4/19/2020. Complaints of shortness of breath. Refused medication on one occasion.
>
> 4/23/2020: agitated and combative. Moore stated that he believed he was due to be released.
>
> 5/9–6/11/2020 (various): refused medication.
>
> 5/10/2020: claimed to be having heart attack. Vitals, EKG normal.
>
> 5/26/2020: negative COVID test.
>
> 5/28–29/2020: treated for a seizure.

(DE 33-1 at 24–51, 98, 110, 117–18, 206–07, 213, 215, *passim*)

It is apparent that these conditions for the most part do not appear in their severest form, and have been managed reasonably well (and could perhaps be managed better with more cooperation from Moore). Nevertheless, it is undisputed that the diagnoses are genuine, and I accept them.[6] The record sets forth not one but multiple conditions that the CDC recognizes as posing an increased risk of severe illness from COVID-19.

### b) Danger of infection at HCCC

To determine whether Mr. Moore's medical condition sets forth extraordinary and compelling conditions, however, I must place it in the context of the risk of COVID infection at HCCC.

---

[5] Medical records reflect that he refused treatment on the following dates: May 1, 4, 5, 6, 9, 10, 11, 17, 21, and 29, 2020; and June 2, 3, and 4, 2020. (DE 33-1 at pp. 9–22, 122–23)

[6] It has not escaped the court's attention that many of these complaints and refusals to take medication coincided with Moore's first request for compassionate release in April and his apparent agitation at not having been released. I do not, however, rely on any implication of malingering, as the medical evidence seems clear enough.

I start with general trends in this geographic area. Although the pandemic is now taking hold in other parts of the country, infections in New Jersey have abated as of this writing. From a peak of some 4500 new positive COVID test results per day in early April, our State is now experiencing rates in the 400s. In Hudson County, the most recent daily figure was 24. *See* https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml (last visited July 27, 2020). Hospitalizations in the northern New Jersey region have decreased from an April high of 5,092 to a total of 322 as of July 26, 2020. *Id.*

I do not make light of that human cost; the fact remains, however, that in New Jersey, as opposed to nationally, the crisis seems to have eased for now. A resurgence remains a possibility, but currently it is only that.

I turn to HCCC itself. Starting in early March, 2020, HCCC instituted procedures to minimize and contain COVID infections. Before the Court is the Sixteenth Amended Declaration of Ron Edwards, director of HCCC. ("Edwards 16th Decl.", DE 35-1) The procedures he describes are multifarious and complex, but I broadly summarize some of them as follows:

- Additional medical staff are on-site and are available to provide medical care 24 hours a day, 7 days a week. The HCCC is equipped with an on-site infirmary.
- The HCCC has also increased the monitoring of all inmates for any symptoms of COVID-19.
- The HCCC has hired additional staff to ensure the cleaning and sanitizing of the facility.
- The HCCC has transitioned all visits to non-contact visits that are conducted through physical, glass barriers.
- The HCCC has begun screening all corrections officers and staff for COVID-19, outside of the facility, prior to beginning their shift. Any symptomatic staff are denied entry into the facility and are sent home.
- All inmates have increased access to soap, which is not shared with other inmates, and have been instructed as to additional measures, such as hand-washing, necessary to stop the spread.

> • HCCC medical personnel visit each cell twice a day to check on the medical and mental health status of every inmate/detainee.

(Edwards 16th Decl., DE 35-1, *passim*).

> For inmates and detainees with health conditions identified in the CDC guidelines as putting them at increased risk for serious illness from COVID-19, including chronic kidney disease, COPD (chronic obstructive pulmonary disease), immunocompromised state (weakened immune system) from solid organ transplant, obesity (body mass index [BMI] of 30 or higher), serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies, sickle cell disease, or type 2 diabetes mellitus, those inmates and detainees are housed in a cell by themselves when applicable. In some instances, however, it may be necessary to house two detainees in a cell based on mental health considerations as discussed above in Paragraph 10. The correctional officers who work with those inmates and detainees are using full PPE including suits, N95 masks and gloves. Additionally, the entire inmate and detainee population has been provided surgical masks.

(*Id.* ¶ 25)

I do not console myself that compliance with these protocols is perfect. But HCCC, once past the initial shock of the outbreak, has caught up, and has had remarkable success in containing infections among prisoners and detainees. Since April 27, 2020, HCCC has tested all law enforcement officers. Testing of others, spotty at first, has become widespread, especially since June 8, 2020, when the director resolved to test everyone in the facility. Of the inmates and detainees, who currently total 718, 696 tests have now been administered.[7] (*Id.* ¶¶ 22, 23)

As of 10:00 a.m. on July 13, 2020, HCCC had identified the following positive COVID-19 test results:

---

[7]    It is not clear that these figures account for newly arriving and released inmates; it may not be accurate to say that that 696 of 718 current inmates have been tested.

- County and federal inmates: 27 cumulative since outbreak began; all have recovered, and no new positive test results have been reported during the past eight weeks.
- ICE detainees: 17 cumulative since outbreak began; all have recovered, and no new positive test results have been reported during the past eight weeks.
- HCCC staff members: 103 cumulative since outbreak began; all but one have recovered and returned to duty, and no new positive test results have been reported during the last two weeks.[8]

(Edwards 16th Decl. ¶ 20)

For his part, Mr. Moore alleges that these measures have not ensured his safety. He cites case law to the effect that inmates at HCCC cannot remain six feet apart at all times, but discounts the ameliorative effect of other safety measures. He stresses the number of inmate cases at HCCC, but fails to take into account that they last occurred two months ago, near the height of the pandemic in New Jersey, and before safety measures had taken effect. He stresses conditions nationwide, but fails to focus on trends locally or within the institution. I do not quarrel with the nationwide and other figures he cites, but my focus is on HCCC itself.

Most pertinent, in my view, are not aspirations but results. If inmates continued to be infected, the stringency of the precautions might not matter; where human life and health are at stake, we do not award A's for effort. Conversely, however, although the Court must consider the danger of future infections, I must give great weight to the institution's track record of success in suppressing infections.

---

[8] All staff who were in proximity of those testing positive were sent home to self-quarantine for the recommended 14-day time period. Tragically, in the earlier days of the outbreak, two members of the HCCC correctional staff, the former facilities commissary director, and two nurses who worked at HCCC died from complications from COVID-19. (*Id.* ¶ 21) There have been no deaths among the prisoners or detainees.

**2. § 3553(a) Factors**

Finally, I must consider the foregoing in the context of the familiar sentencing factors of 18 U.S.C. § 3553(a), "to the extent that they are applicable[.]" 18 U.S.C. § 3582(c)(1)(A).[9]

---

[9] **(a) Factors To Be Considered in Imposing a Sentence. —** The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed—

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for—

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

**(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement—

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet

Mr. Moore was arrested for and convicted of illegal possession of a loaded handgun by a felon. That is a serious offense. According to defense counsel, the state charges arising from the same arrest were receiving stolen property and obtaining CDS by fraud. The state sentence was imposed concurrently.

As for the defendant's history, to say he has a "prior felony" understates the case. Approximately 30 at the time of his arrest, he had compiled a record of some seven felony convictions. For some, he has received sentences of probation, but has never completed a probationary term without violations. At the time of sentencing in this case, he had an outstanding violation of probation matter in Essex County. His criminal history includes offenses that cast further doubt on the efficacy of supervision, including bail jumping, resisting arrest, hindering, and obstruction. (PSR ¶¶ 38–46)

Now, as at sentencing, counsel points to mitigating factors. Mr. Moore's three felony and three misdemeanor convictions for drug offenses occurred years ago, when he was between the ages of 19 and 22. Within the last seven years, he has two convictions for bail jumping and resisting arrest, which are serious but do not involve drugs or use of weapons. Counsel attributes the current firearms offense, his most serious in some time, to his mental state following the shooting death of his brother.

Defendant did not have a good start in life, but improved his lot. He left gang associations behind and has been drug and alcohol free for some nine years. He has been employed. He is in a stable relationship with a partner and her two children, with whom he will live when released.

---

      to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

    **(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The sentence of 30 months' imprisonment reflected the court's best judgment as to what was needed to address the seriousness of the offense, promote respect for the law, provide just punishment, and deter others. Based on a relatively modest offense level of 12, it was imposed at the bottom of the resulting Guidelines range of 30–37 months. Individual deterrence and protection of the public remain a concern, given the defendant's history.

A major countervailing factor, however, is defendant's relatively short projected release date; according to the government, it is scheduled for November 6, 2020, less than four months from now.[10] To that extent, the purposes of sentencing have been fulfilled already.[11]

The remaining 3553(a) factors do not require extensive discussion. Any compassionate release would, of course, create a disparity, though not necessarily an unwarranted one. The Guidelines and policy statements have been calculated and considered. Restitution is not an issue. Rehabilitative programs, too, are unlikely to have much effect at this point, to the extent they are even available.

\*   \*   \*

Weighing all of the relevant factors, I will deny the application. The medical impairments are indeed risk factors, and they are real. With the

---

[10] Defendant has served some 19 months; the full 30 months would not run until mid-2021. The projected release date of November 6, 2020 reflects credit for time served since the July 1, 2018 arrest, as well as good time credit earned and anticipated. The projected November release date is reported as a "home detention eligibility date." (DE 33-5) It therefore would not involve the risk of COVID in the setting of a halfway house.

[11] The government suggests that this relatively short span carries with it a smaller risk of infection as well. That is probably so, but I am wary of making the percentage of sentence served a "heads I win, tails you lose" factor. Setting aside other considerations, it seems anomalous that service of any percentage of a sentence, whether small or large, will be held against a defendant. The spirit of §§ 3582 and 3553(a) suggests to me that the more usual course would be to prioritize defendants who have discharged a greater percentage of their sentences. *See, e.g., Pawlowsky*, slip op. at 4, 2020 WL 3483740 at \*2 (district court permissibly weighed service of "just 19 months of a 180 month sentence" against the defendant's release). As the sentence approaches completion, the government's countervailing interests correspondingly decrease.

13

possible exception of obesity, they appear to be appropriately cared for and under control. Given the success of anti-COVID measures at HCCC, it is not clear that release would dramatically improve the defendant's chances of avoiding infection. As things stand now, the institution is not experiencing any sort of outbreak among the inmate population. Finally, the § 3553(a) factors, although they point both ways, do weigh in favor of the defendant's finishing service of the sentence imposed, particularly in light of the defendant's recidivism.

### C. Transfer to Home Confinement

There is a separate remedy, committed to the discretion of the Bureau of Prisons, which may apply even in the absence of an application by the inmate. BOP is statutorily authorized to transfer certain inmates to home confinement during the last six months or 10% of a sentence. *See* 18 U.S.C. § 3624(c)(2), 34 U.S.C. § 60541(c). Pursuant to guidelines promulgated by the Attorney General, BOP instituted its own review in response to the COVID-19 pandemic. It prioritized certain cases for transfer to home confinement, based on inmate characteristics, the inmate's disciplinary record, medical risk, danger to the community, and other factors. Priority was given to three institutions, FCI Oakdale, Danbury, and Elkton, where the risk and need were most acute. Under the CARES Act, BOP was authorized to, and did, extend the maximum amount of time for which home confinement could be substituted for imprisonment. *See* CARES Act § 12003(b). BOP is currently prioritizing inmates who have served 50% of their sentences or have served 25% and have less than 18 months remaining.

Mr. Moore moves in the alternative to invoke that remedy of transfer to home confinement, pursuant to 18 U.S.C. § 3624(c). As to such an application, however, the BOP has the first and last word. The statute does not grant the district court authority to modify the sentence in that manner, and a district court has no general authority to dictate the place of confinement as such. *See* 18 U.S.C. 3621(b); *United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993);

*Gottstein v. Finley*, 3:20-cv-0935, 2020 WL 3078028, at *6-*7 (M.D. Pa. June 10, 2020) (holding that the determination of whether an inmate is eligible for home confinement under the CARES Act rests solely with the BOP); *United States v. Catanzarite*, No. 18-cr-0362, 2020 WL 2786927, at *2 (D.N.J. May 29, 2020) (denying motion to convert sentence to home confinement because inmate did not suggest any authority to rebut Government's argument that the court lacked authority to do so). Nor does a federal prisoner have a constitutional right to service of sentence in a particular place. *See Sandin v. Connor*, 515 U.S. 472, 478 (1995).

Mr. Moore's alternative request for relief under 18 U.S.C. § 3624(c) must therefore be denied.

### ORDER

Accordingly, for the reasons expressed above,

IT IS this 27th day of July, 2020

ORDERED that the motion (DE 33) for compassionate release under 18 U.S.C. § 3582(c)(1)(A), or in the alternative for transfer to home confinement under 18 U.S.C. § 3624(c), is DENIED.

It has come to the Court's attention that defense counsel is in the process of attempting to obtain additional medical records. Nevertheless, a prompt ruling seemed preferable. Should those records alter the medical picture, or should conditions at HCC change, the court will entertain a motion for reconsideration on short notice.

/s/ Kevin McNulty
_____
KEVIN MCNULTY
United States District Judge